UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| KRISTIE A. CHRAPKOWSKI,<br><br>                Plaintiff,<br><br>v.<br><br>CAROLYN W. COLVIN, Acting<br>Commissioner of Social Security,<br><br>          Defendants. | Case No. 1:15-cv-00437-CWD<br><br>**MEMORANDUM DECISION AND ORDER** |

## INTRODUCTION

Currently pending before the Court is Kristie Chrapkowski's Petition for Review of the Respondent's denial of social security benefits, filed on September 21, 2015. (Dkt. 1.) The Court has reviewed the Petition for Review and the Answer, the parties' memoranda, and the administrative record (AR), and for the reasons that follow, will remand the decision of the Commissioner.

## PROCEDURAL HISTORY

Petitioner filed an application for Disability Insurance Benefits and Supplemental Security Income on November 27, 2012. This application was denied initially and on reconsideration, and a hearing was held on April 16, 2014, before Administrative Law Judge (ALJ) John Molleur. After hearing testimony from Petitioner and a vocational expert, ALJ Molleur issued a decision on May 21, 2014, finding Petitioner not disabled. Petitioner timely requested review by the Appeals Council, which denied her request for review on July 29, 2015.

Petitioner appealed this final decision to the Court. The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).

At the time of the hearing, Petitioner was forty-six years of age. Petitioner has a high school education, and her prior work experience includes work as a cashier.

## SEQUENTIAL PROCESS

The Commissioner follows a five-step sequential evaluation for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920. At step one, it must be determined whether the claimant is engaged in substantial gainful activity. The ALJ found Petitioner had not engaged in substantial gainful activity since her alleged onset date of November 27, 2012. At step two, it must be determined whether the claimant suffers from a severe impairment. The ALJ found Petitioner's fibromyalgia, peripheral neuropathy, hepatitis C, and osteoarthritis of the hands and feet severe within the meaning of the Regulations.

Step three asks whether a claimant's impairments meet or equal a listed impairment. The ALJ found Petitioner's impairments did not meet or equal the criteria for the listed impairments, specifically considering Petitioner's fibromyalgia under Sections 1.00 and 11.00, which address musculoskeletal impairments and neurological disorders, respectively. The ALJ considered also whether Petitioner's peripheral neuropathy met Listing 11.14 (peripheral neuropathies), and whether Petitioner's hepatitis C met Listing 5.05 (Chronic liver disease). And finally, the ALJ considered whether Petitioner's osteoarthritis met Listing 1.02 (major dysfunction of a joint). The ALJ determined none of Petitioner's impairments met or equaled the criteria for the listed impairments considered.

If a claimant's impairments do not meet or equal a listing, the Commissioner must assess the claimant's residual functional capacity (RFC) and determine, at step four, whether the claimant has demonstrated an inability to perform past relevant work. In assessing Petitioner's functional capacity, the ALJ determines whether Petitioner's complaints about the intensity, persistence and limiting effects of her pain are credible. Here, the ALJ found Petitioner's complaints not entirely credible. The ALJ found also that the medical source statement of Petitioner's treating physician, Dr. Knorpp, was not consistent with the medical records from Petitioner's onset date forward. Accordingly, the ALJ gave Dr. Knorpp's opinion minimal weight. After so doing, the ALJ determined Petitioner retained the RFC to perform sedentary work, with limitations on crouching, stooping, balancing and crawling, and that her grip strength bilaterally was further

impaired. With regard to Petitioner's mental limitations due to fibromyalgia, the ALJ limited Petitioner to simple, three and four step tasks.

The ALJ found Petitioner not able to perform her past relevant work as a cashier. If a claimant demonstrates an inability to perform past relevant work, the burden shifts to the Commissioner to demonstrate, at step five, that the claimant retains the capacity to make an adjustment to other work that exists in significant levels in the national economy, after considering the claimant's residual functional capacity, age, education and work experience. Here, the ALJ found Petitioner retained the ability to perform the requirements of representative occupations such as food and beverage order clerk; ticket checker; and surveillance system monitor. Consequently, the ALJ determined Petitioner was not disabled.

## STANDARD OF REVIEW

Petitioner bears the burden of showing that disability benefits are proper because of the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A); *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971). An individual will be determined to be disabled only if her physical or mental impairments are of such severity that she not only cannot do her previous work but is unable, considering her age, education, and work experience, to engage in any other kind of substantial gainful work which exists in the national economy. 42 U.S.C. §

423(d)(2)(A).

On review, the Court is instructed to uphold the decision of the Commissioner if the decision is supported by substantial evidence and is not the product of legal error. 42 U.S.C. § 405(g); *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474 (1951); *Meanel v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (as amended); *DeLorme v. Sullivan*, 924 F.2d 841, 846 (9th Cir. 1991). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a preponderance, *Jamerson v Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997), and "does not mean a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

The Court cannot disturb the Commissioner's findings if they are supported by substantial evidence, even though other evidence may exist that supports the petitioner's claims. 42 U.S.C. § 405(g); *Flaten v. Sec'y of Health & Human Servs.*, 44 F.3d 1453, 1457 (9th Cir. 1995). Thus, findings of the Commissioner as to any fact, if supported by substantial evidence, will be conclusive. *Flaten*, 44 F.3d at 1457. It is well-settled that, if there is substantial evidence to support the decision of the Commissioner, the decision must be upheld even when the evidence can reasonably support either affirming or reversing the Commissioner's decision, because the Court "may not substitute [its] judgment for that of the Commissioner." *Verduzco v. Apfel*, 188 F.3d 1087, 1089 (9th Cir. 1999).

**MEMORANDUM DECISION AND ORDER - 5**

When reviewing a case under the substantial evidence standard, the Court may question an ALJ's credibility assessment of a witness's testimony; however, an ALJ's credibility assessment is entitled to great weight, and the ALJ may disregard a claimant's self-serving statements. *Rashad v. Sullivan*, 903 F.2d 1229, 1231 (9th Cir. 1990). Where the ALJ makes a careful consideration of subjective complaints but provides adequate reasons for rejecting them, the ALJ's well-settled role as the judge of credibility will be upheld as based on substantial evidence. *Matthews v. Shalala*, 10 F.3d 678, 679-80 (9th Cir. 1993).

## DISCUSSION

Petitioner contends the ALJ erred at step four in assessing her credibility and in rejecting the opinion of her treating physician, Dr. Knorpp.

### 1.    **Petitioner's Credibility**

The ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and resolving ambiguities. *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998). The ALJ's findings must be supported by specific, cogent reasons. *Reddick*, 157 F.3d at 722. If a claimant produces objective medical evidence of an underlying impairment, an ALJ may not reject a claimant's subjective complaints of pain based solely on lack of medical evidence. *Burch v. Barnhart*, 400 F.3d 676, 680 (9th Cir. 2005). *See also Light v. Soc. Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (holding that an ALJ may not discredit a claimant's subjective testimony on the basis that there is no objective medical evidence that supports the testimony).

When assessing the credibility of a claimant's testimony regarding subjective pain or the intensity of symptoms, the ALJ engages in a two-step analysis. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). First, the ALJ must determine whether there is "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other symptoms alleged." *Id*. If the claimant has presented such evidence, and there is no evidence of malingering, the ALJ must give "specific, clear and convincing reasons" to reject the claimant's testimony about the severity of the symptoms. *Id*. At the same time, the ALJ is not "required to believe every allegation of disabling pain, or else disability benefits would be available for the asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A)." *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989).

In evaluating the claimant's testimony, the ALJ may use "ordinary techniques of credibility evaluation." *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1224 n.3 (9th Cir. 2010). For instance, the ALJ may consider inconsistencies either in the claimant's testimony or between the testimony and the claimant's conduct, *id.*; "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment," *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008); and "whether the claimant engages in daily activities inconsistent with the alleged symptoms," *Lingenfelter v. Astrue*, 504 F.3d 1028, 1040 (9th Cir. 2007). While a claimant need not "vegetate in a dark room" to be eligible for benefits, *Cooper v. Bowen*, 815 F.2d 557, 561 (9th Cir. 1987), the ALJ may discredit a claimant's testimony when the claimant reports

participation in everyday activities indicating capacities that are transferable to a work setting, *see Morgan v. Comm'r Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999). Even where those activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent they contradict claims of a totally debilitating impairment. *See Turner*, 613 F.3d at 1225.

The reasons an ALJ gives for rejecting a claimant's testimony must be supported by substantial evidence in the record. *Regennitter v. Comm'r of Soc. Sec. Admin.*, 166 F.3d 1294, 1296 (9th Cir. 1999). If there is substantial evidence in the record to support the ALJ's credibility finding, the Court will not engage in second-guessing. *Thomas v. Barnhart, 278 F.3d 957, 959 (9th Cir. 2002).* When the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

### A.     *Failure to Seek Treatment*

Petitioner first argues the ALJ improperly discounted Petitioner's testimony about the persistence of her pain because Petitioner sought "minimal treatment in 2012" other than for a right ankle ganglion cyst and for a well-woman exam in June of 2012, and medical records did not show any additional treatment for her fibromyalgia pain until September of 2013, a "striking treatment gap for someone claiming disability since November 2012." (AR 25-26.) Petitioner argues it was error for the ALJ to conclude that these treatment gaps indicated Petitioner's symptoms were not as severe as she claimed, because Petitioner lacked the means necessary to pursue treatment. (Dkt. 14 at 11.)

"Disability benefits may not be denied because of the claimant's failure to obtain treatment he cannot obtain for lack of funds." *Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007). In *Orn*, the Ninth Circuit determined the claimant's failure to receive medical treatment during the period that he had no medical insurance could not support an adverse credibility finding. *Id*.

Here, there is substantial evidence of Petitioner's economic hardship from November of 2012 to September of 2013 to excuse Petitioner's failure to seek treatment for her fibromyalgia pain. For instance, on March 1, 2013, Petitioner sought treatment from Dr. Pearce. The treatment notes indicate Petitioner had no insurance, and was a "self pay." Further, it was noted that Petitioner complained of pain since October of 2012, but "was not able to be seen by Lagwinski (her rheumatologist) due to outstanding balance." (AR 463.) At the March 1, 2013 appointment, Petitioner was noted to be in mild distress due to joint pain.

Petitioner was seen on July 30, 2013, by Dr. Knorpp, when Petitioner again requested to be seen by a rheumatologist. (AR 545.) Petitioner complained of "increasing pain in her hands, and legs, shoulders, feet, knees and hips…. [and] numbness in her feet and legs." Upon examination, Dr. Knorpp noted tenderness in Petitioner's left hand, as well as her MCP joint, DIP joint, and PIP joint, along with tenderness with range of motion of all toes. (AR 547.)

On August 27, 2013, Petitioner reported to Dr. Knorpp that she recently had visited the Emergency Room after suffering a severe headache, and decreased vision in

her left eye. (AR 542.) Petitioner reported also that she could not afford to see an eye doctor or the rheumatologist but was working on getting patient assistance. (AR 542.)

On September 13, 2013, Petitioner saw Dr. Timmons. (AR 499.) Petitioner reported pain in her feet, fingers, ankles, arms, neck, hips, knees, eyes, and head, and that she had sought treatment from Dr. Lagwinski (a rheumatologist) for a few visits in 2011. However, Petitioner was unable to find out the results of lab studies and x-rays taken by Dr. Lagwinski because of her "outstanding bill." (AR 499.) Upon examination, Dr. Timmons noted pain to palpitation along Petitioner's bilateral medial and lateral epicondylar regions; wrists, MCP, PIP, and DIP joints diffusely tender to palpitation; and MTP joints tender to palpitation. (AR 501.) On September 19, 2013, Petitioner had x-rays taken of her hands and feet which showed "moderate joint space narrowing" in the joints of her right foot; "mild" narrowing of the joints in her left foot; and mild joint space narrowing in the joints of her hands, consistent with degenerative osteoarthritis. (AR 509-510.)

On October 29, 2013, Petitioner saw Dr. Knorpp, complaining of pain which was controlled, but not improved, despite taking hydrocodone as needed. (AR 539.) Petitioner reported increased generalized pain and weakness with difficulty doing normal activities, and pain in her feet, back, shoulders, arms, and knees. (AR 539.) Dr. Timmons started her on amitriptyline for fibromyalgia pain. (AR 541.)

On November 4, 2013, Petitioner saw Dr. Timmons, reporting morning stiffness, and no change in her fibromyalgia related symptoms, with diffuse pain and fatigue. (AR

495.) Examination results revealed pain to palpitation, and diffuse tender points throughout the musculature. (AR 497.)

Respondent makes no mention of this evidence in her response brief, instead arguing only that the failure to seek treatment is sufficient to discredit Petitioner's testimony. While that may be true in the abstract, the ALJ erred in not referencing any of Petitioner's financial problems in 2012 and 2013, which prevented her from seeking follow up treatment. Further, far from a "treatment gap," the record indicates Petitioner did seek treatment for, and complained of, diffuse joint pain and myalgias throughout 2013. An "adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering ... information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment," including inability to pay. SSR 96–7p, 1996 WL 374186, at *7–8 (July 2, 1996); *Orn*, 495 F.3d at 638.

The Court finds the ALJ's failure to consider evidence of Petitioner's financial hardship to explain her failure to seek additional treatment during 2012 and 2013, and the evidence in the record indicating she sought treatment when she could throughout the time frame referenced by the ALJ, was in error. Accordingly, this period of minimal appointments in Petitioner's treatment history is not proper justification for an adverse credibility finding.

**B.** *Reasons for Discontinuing Work*

The next reason the ALJ gave for discrediting Petitioner's testimony about the

limiting effects of her symptoms was her report to her physicians she was experiencing extreme pain and limitations back to 2010 and 2011, a period of time when she remained working. (AR 26.) The ALJ noted that, in recent medical records, Petitioner "created a more severe narrative for the years of 2010 and 2011." (AR 27.) For support, the ALJ cited to Exhibit 20F at 11, and 15F at 10-2. (AR 499, 561; AR 26.)

Upon reviewing the documents cited by the ALJ for support, the Court finds the ALJ misstates the record. In December of 2013, the only statement by Petitioner was that her bilateral foot paresthesias began in 2010 or 2011, beginning in the right foot and then progressing to both feet. (AR 561.) In September of 2013, Petitioner similarly reported that her "symptoms began around 2010 or 2011." (AR 499.) At no time did Petitioner report to her care providers in 2013 that the severity of symptoms she was then reporting were at the same level of severity during 2011 and 2012.

Upon review of the records from 2011 and 2012, it is clear Petitioner sought care from Dr. Lagwinski for mild pain in her hands and wrists, beginning in March of 2011. (AR 441.) Prior to being sent to Dr. Lagwinski, Petitioner saw Dr. Knorpp on January 11, 2011, complaining of pain to light touch, which had not been getting any worse or better after it started. (AR 381.) Dr. Knorpp noted tenderness to moderate pressure in many areas. (AR 381.) In other words, the records reveal Petitioner's symptoms began in 2011, and she sought an explanation for them. However, the medical records from that time period, which the ALJ conveniently ignored, do not reflect that she was experiencing "extreme pain and limitations," nor do they reflect that, in 2013, Petitioner misstated the

onset of her more severe symptoms.

Rather, the record reveals, as the ALJ correctly noted, Petitioner's reported symptoms worsened over time. Her mild symptoms reported to care providers in 2011 contrast markedly with her reported symptoms to Dr. Knorpp and Dr. Timmons in September and November of 2013, wherein she reported her pain as worse all over, with shooting pain, swelling, and a deep, flu-like aching pain. (AR 499, 537.) Furthermore, the ALJ's conclusion that Petitioner was able to work previously with the same symptoms she reported in 2013 is inconsistent with the ALJ's finding that Petitioner cannot perform her past relevant work. (AR 30.) Substantial evidence in the record does not support the ALJ's conclusion that Petitioner worked in 2010 and 2011 with the same level of impairment she reported after her alleged onset date.

As for Petitioner's reasons for leaving work, the ALJ found Petitioner not credible because she purportedly left her job at Cloningers Harvest Foods in November of 2012 when a personal relationship ended, and she moved home to take care of her grandmother. (AR 24.) The record reveals Petitioner left her job to care for her grandmother, but that her symptoms worsened, preventing her from continuing to provide that care. (AR 49.) At that point, Petitioner moved in with her mother. (AR 50.) Discontinuing work for reasons other than her impairments is a sufficient basis to disregard testimony. *Bruton v. Massanari*, 268 F.3d 824, 828 (9th Cir. 2001). But, Petitioner reported on September 13, 2013, to Dr. Timmons that she stopped working in November of 2012 for "health reasons." (AR 499.) The evidence on this aspect of

Petitioner's testimony is equivocal, and therefore the Court will not disturb the ALJ's conclusion in this regard.

### C.     Objective Medical Evidence

The final reason the ALJ found Petitioner not credible was because Petitioner's allegations were inconsistent with the objective medical evidence. (AR 26.) Respondent argues Petitioner's allegations were inconsistent with the objective medical evidence, because objective findings were minimal, and the ALJ properly relied upon the opinion of Dr. Bates, a consultative examining physician who reviewed the record and conducted an examination of Petitioner on February 7, 2013. (Dkt. 25 at 5; AR 414 - 416.) Respondent provides little support for her argument.

In a case involving fibromyalgia, the ALJ commits error when he or she requires "'objective' evidence for a disease that eludes such measurement." *Benecke v. Barnhart*, 379 F.3d 587, 594 (9th Cir. 2004).  Petitioner consistently reported severe fibromyalgia symptoms both before and after diagnosis. Every single physician who treated Petitioner, including treating physicians Timmons and Knorpp, noted diffuse tender spots upon palpitation. (AR 493, 501.) Ultrasound studies from 2011 indicated possible rheumatoid arthritis because of evidence of synovitis. (AR 493.) Ultimately, however, the physicians concluded Petitioner's hepatitis C may explain her diffuse joint pain, together with fibromyalgia. (AR 501, 502.) On February 14, 2014, Petitioner's viral load was

5,671,191, a level considered high.[1] Consulting physician Dr. Lukas Clark, a neurologist who examined Petitioner on February 14, 2014, indicated Petitioner reported symptoms consistent with neuropathic pain in the lower extremities, which may be caused by her hepatitis C. (AR 572.)

Dr. Bates's opinion evidence does not constitute substantial evidence upon which to discredit the medical evidence of record, wherein Petitioner consistently reported to her physicians symptoms consistent with fibromyalgia and hepatitis C. *See Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989) ("Once a claimant submits objective medical evidence establishing an impairment that could reasonably be expected to cause some pain, 'it is improper as a matter of law for an ALJ to discredit excess pain testimony solely on the ground that it is not fully corroborated by objective medical findings.'").

The medical opinion evidence will be discussed further in the context of considering Petitioner's argument that the AJL erred in rejecting Dr. Knorpp's opinion.

### D.    Petitioner's Additional Arguments

Petitioner argued the ALJ's reasoning was flawed for two additional reasons, which Respondent did not address in her brief. Petitioner argues the ALJ's conclusion discrediting Petitioner's pain testimony because her treatment was hampered by multiple medical providers taking time to rule out various etiologies to decide on a helpful course of treatment is not a reason to question Petitioner's subjective complaints of pain. (Dkt. 14 at 10.) It appears the ALJ seeks to discredit Petitioner's complaints on the grounds

---

[1] *See* http://www.webmd.com/hepatitis/c-hcv-viral-load#1 (Anything over 800,000 is usually considered high).

that, if the medical care providers had agreed on a course of treatment sooner, Petitioner's condition would have improved. However, such a conclusion is mere speculation without substantial support in the medical record. The fact that medical care providers experienced difficulty deciding on an appropriate course of treatment in a complex case is not a permissible legal reason to reject Petitioner's subjective reports of pain.

Last, Petitioner argues the ALJ's conclusion that, once a course of treatment was chosen, Petitioner would improve with additional medication, is a speculative reason not supported by the record. Dr. Clark on February 14, 2014, did indicate Petitioner's dosages of amitriptyline and gabapentin could be increased significantly for better effect, but that there would be side effects of nausea and drowsiness. (AR 573.) From this statement, the ALJ extrapolated "the claimant has seen immediate positive effect from the combination of amitriptyline and gabapentin with a significant amount of overhead for increasing her dosage and for symptom improvement." (AR 27.) The ALJ next noted Petitioner reported to Dr. Timmons on April 3, 2014, that she was experiencing no more morning gelling but only some stiffness throughout the day, (AR 27, 564), and that a few days later, Dr. Knorpp increased her gabapentin and amitriptyline. (AR 27.)

What the ALJ omits, however, is that, despite the medication, Petitioner reported to Dr. Timmons that she felt as if her hands were swollen all of the time, with no change over base line, and she rated her pain as "7-8 (diffuse pain)." (AR 564.) The record lacks substantial evidence that Petitioner experienced greater relief on the higher doses of the prescribed medication, and the ALJ failed to account for the increase in drowsiness, a

potential side effect. Dr. Knorpp instructed Petitioner not to drive while on the

amitriptyline because of the drowsiness Petitioner reported. (AR 537 - 538.) The Court

finds the ALJ's opinion Petitioner would improve significantly on higher doses of

medication is speculative, and not supported by substantial evidence in the record.[2]

## 2.    Physician Testimony

The Ninth Circuit Court of Appeals distinguishes among the opinions of three

types of physicians: (1) those who treat the claimant (treating physicians); (2) those who

examine but do not treat the claimant (examining physicians); and (3) those who neither

examine nor treat the claimant (nonexamining physicians). *Lester v. Chatter*, 81 F.3d

821, 830 (9th Cir. 1995). As a general rule, more weight should be given to the opinion

of a treating source than to the opinion of doctors who do not treat the claimant. *Winans*

*v. Bowen*, 853 F.2d 643, 647 (9th Cir. 1987).

Where the treating doctor's opinion is not contradicted by another doctor, it may

be rejected only for "clear and convincing" reasons. *Baxter v. Sullivan*, 923 F.2d 1391,

1396 (9th Cir. 1991). Also, "clear and convincing" reasons are required to reject the

treating doctor's ultimate conclusions. *Embrey v. Bowen*, 849 F.2d 418, 422 (9th Cir.

1988). Even if the treating doctor's opinion is contradicted by another doctor, the

Commissioner may not reject this opinion without providing "specific and legitimate

reasons" supported by substantial evidence in the record for so doing. *Murray v. Heckler*,

---

[2] Petitioner argues also the ALJ failed to consider the effects of Petitioner's obesity upon her impairments. However, the Court finds that there is little support in the medical records indicating obesity played a part in Petitioner's disease progression. Not one of Petitioner's physicians appeared to attribute obesity as either a cause of or factor related to her symptoms.

722 F.2d 499, 502 (9th Cir. 1983).

The opinion of an examining physician is, in turn, entitled to greater weight than the opinion of a nonexamining physician. *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984). As is the case with the opinion of a treating physician, the Commissioner must provide "clear and convincing" reasons for rejecting the uncontradicted opinion of an examining physician. *Pitzer*, 908 F.2d at 506. And, like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor, can be rejected only for specific and legitimate reasons that are supported by substantial evidence in the record. *Andrews v. Shalala*, 53 F.3d 1035, 1043 (9th Cir. 1995).

An ALJ is not required to accept an opinion of a treating physician if it is conclusory and not supported by clinical findings. *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992). Additionally, an ALJ is not bound to a physician's opinion of a claimant's physical condition or the ultimate issue of disability. *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989). If the record as a whole does not support the physician's opinion, the ALJ may reject that opinion. *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195 (9th Cir. 2004). Items in the record that may not support the physician's opinion include clinical findings from examinations, conflicting medical opinions, conflicting physician's treatment notes, and the claimant's daily activities. *Id.*; *Bayliss v. Barnhart*, 427 F.3d 1211 (9th Cir. 2005); *Connett v. Barnhart*, 340 F.3d 871 (9th Cir. 2003); *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595 (9th Cir. 1999). An

ALJ also may reject a treating physician's opinion if it is based "to a large extent" on a claimant's self-reports that have been property discounted as not credible. *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).

Dr. Knorpp completed a medical source statement on March 18, 2014, opining Petitioner could sit for a maximum of two hours in an 8-hour workday, stand/walk for less than 2 hours in an 8-hour workday, require 10-minute breaks every 30 minutes, be unable to use her hands and arms, would be off-task 25 percent or more of each workday, and would miss about four days of work each month. (AR 28; 515.) There is also a letter dated March 6, 2014, from Dr. Knorpp indicating Petitioner could not work due to her medical conditions. (AR 568.)

In contrast, Dr. Bates examined Petitioner on February 7, 2013, and while he assessed rheumatoid arthritis, Dr. Bates was of the opinion Petitioner could tolerate work at the sedentary level provided Petitioner could frequently alternate between sitting, standing and walking. (AR 26, 416.) The ALJ gave "prominent weight to the opinion of Dr. Bates," with the exception of the limitation that Petitioner would need to alternate positions, because the diagnosis of arthritis was not a proper diagnosis. Further, the ALJ found a basis for including upper extremity limitations due to Petitioner's complaints of upper extremity pain due to her fibromyalgia symptoms. (AR 26.)

The ALJ gave Dr. Knorpp's opinion "minimal weight," on the grounds that: (1) Petitioner worked for more than one year after seeing Dr. Knorpp; (2) she sought no significant treatment in her first year after the alleged onset date; (3) medical care

providers could not agree on treatment, thereby postponing effective treatment; (4) her narrative about her symptoms described in 2010 and 2011 changed; (5) with further medication, Petitioner would improve; and (6) Dr. Knorpp's opinion was simply a snapshot of Petitioner on her worst day, and not consistent with any medical records from the Petitioner's alleged onset date forward.

Regarding the first five reasons, the Court discussed above the errors with regard to the ALJ's reasoning in the context of the ALJ's credibility assessment. Thus, only reason six remains, and it is not a specific or legitimate reason supported by substantial evidence in the record.

Dr. Knorpp's opinion is no more or less of a snapshot than Dr. Bates's opinion, which was formed after one consultative examination, in contrast to Dr. Knorpp's treating relationship with Petitioner since 2011. According to the medical records from Petitioner's alleged onset date of November 18, 2012, forward, Petitioner complained of worsening pain. She experienced an inability to obtain treatment due to lack of funds until September of 2013, when she established a relationship with Dr. Timmons (AR 26), and thereafter underwent a series of evaluations by various providers. By February 4, 2014, Petitioner rated her pain as an 8 on a 10-point scale, reporting diffuse pain and swollen joints. (AR 490.) The ALJ does not explain his conclusion that Petitioner's treatment records contradict Dr. Knorpp's opinion, especially when no physician who treated Petitioner from November of 2012 onward believed her to be malingering or overstating her symptoms.

There is nothing in the record to indicate a lack of objectivity on Dr. Knorpp's part, especially considering he treated Petitioner for over three years. In contrast, Dr. Bates examined Petitioner once, and based his decision largely on an evaluation of orthopedic factors, and not on pain or fatigue, the classic hallmarks of fibromyalgia. Nor did Dr. Bates address Petitioner's ability to perform work on a sustained basis in light of the pain caused by Petitioner's hepatitis C and fibromyalgia symptoms. Accordingly, the Court concludes it was error for the ALJ to discount Dr. Knorpp's opinion.

# ORDER

**NOW THEREFORE IT IS HEREBY ORDERED:**

1)      Plaintiff's Petition for Review (Dkt. 1) is **GRANTED**.

2)      This action shall be **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

3)      This Remand shall be considered a "sentence four remand," consistent with 42 U.S.C. § 405(g) and *Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).

DATED: January 10, 2017

Honorable Candy W. Dale
United States Magistrate Judge